UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-1075

UNITED PAPERWORKERS INTERNATIONAL UNION,
LOCAL 14, AFL-CIO-CLC, ET AL.,

Plaintiffs - Appellants,

v.

INTERNATIONAL PAPER COMPANY,

Defendant - Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge] 



Before

Torruella, Chief Judge, 

Campbell, Senior Circuit Judge, 

and Cyr, Circuit Judge. 



Jeffrey Neil Young, with whom McTeague, Higbee, Libner, 
MacAdam, Case & Watson was on brief for appellants. 
Jane B. Jacobs, with whom Andrew E. Zelman and Klein, 
Zelman, Briton, Rothermel & Dichter, L.L.P. were on brief for 
appellee.



September 7, 1995


TORRUELLA, Chief Judge. The plaintiff-appellants, TORRUELLA, Chief Judge 

United Paperworkers International Union, Local 14, AFL-CIO, and

International Brotherhood of Firemen and Oilers, Local 246, AFL-

CIO (the "Unions"), appeal the district court's decision on

summary judgment in favor of International Paper Company (the

"Company"), ruling that a recall agreement between the Unions and

the Company became unenforceable upon the Unions'

decertification. For the following reasons, we affirm.

BACKGROUND BACKGROUND

The Unions and the Company agree that there are no

material facts in dispute. The Company owns and operates a paper

mill in Jay, Maine known as the Androscoggin Mill (the "Mill").

Between 1965 and March 1993, employees at the Mill were

represented for purposes of collective bargaining by the Unions.

Throughout that time, the Unions and the Company have been

parties to a series of collective bargaining agreements setting

forth the terms and conditions of employment at the Mill. In

June 1987, when the Company and the Unions could not reach an

accord over a succeeding collective bargaining agreement, members

of the Unions engaged in an economic strike. The Company hired

replacement workers during the strike.

In October of 1987, the Company laid off 151 striking

employees (the "Employees"). All but three of these Employees

had recall rights for twelve months after layoff.1 The twelve
 

1 The other three employees resigned in 1989 pursuant to a
pension offer negotiated by the Unions. Therefore, these three
employees are not at issue in this case.

-2-

month period in which the Employees were eligible for recall

expired before the parties began strike settlement negotiations.

On November 16, 1987, certain Mill employees petitioned

the National Labor Relations Board (the "NLRB") to hold a

decertification election to determine whether the Mill employees

desired continued representation by the Unions. The actual

election was delayed for over a year.

On October 9, 1988, the Unions ended their strike and

made an unconditional offer to return to work. Between October

18 and October 26, 1988, the Unions and the Company negotiated

and executed an agreement setting forth terms and procedures

under which former strikers would be recalled as replacement

workers left and their positions became available. During

negotiations, the Unions raised the issue of the 151 Employees

who had been laid off in October 1987 and whose recall rights had

technically expired. The final recall agreement provided, with

limited exceptions, that the 151 laid off Employees would be

among the employees recalled under the agreement.

In April 1989, at the Unions' request, portions of the

recall agreement were renegotiated and amended to include lists

setting forth the order in which employees were to be recalled.

The 151 laid off Employees were included on these lists. Both

the October 1988 agreement and the April 1989 amended agreement

were silent as to its duration or termination. The

decertification petition was pending throughout the negotiations.

-3-

In July 1989, the NLRB conducted a decertification

election at the Mill. Of the employees eligible to vote, 616

voted for decertification, and 361 voted against. After

investigating and holding a hearing on the Unions' challenge to

the election, the NLRB issued a decision upholding the election

results and dismissing the Unions' objections. The Unions thus

became decertified as of March 30, 1993. Both parties

acknowledge that upon decertification, the then-existing

collective bargaining agreement, which would otherwise have been

effective until September 30, 1993, became null and void.

In August 1993, the Company advised the Unions and

several of the 151 laid off Employees that as a result of the

Unions' decertification, the Employees no longer had recall

rights. The Unions thereafter filed this action in the United

States District Court for the District of Maine, contending that

the recall agreement, unlike the collective bargaining agreement,

survived the Unions' decertification and thus remained binding on

the Company.

Following cross-motions for summary judgment, the

district court issued its decision on December 1, 1994. The

district court found that there was no indication in the recall

agreement itself that the parties intended it to survive

decertification, despite the fact that the decertification

petition had been filed and was pending during the negotiation of

the agreement. The court explained that because the recall

agreement establishes rights for a category of represented

-4-

employees, and explicitly specifies that its terms are to prevail

if there is any conflict with "other provisions of the labor

agreement," the recall agreement is "tied directly to the

collective bargaining agreement," such that it contemplates

"ongoing union involvement." Because the recall agreement would

affect the Company's negotiations with a new union seeking to

represent a majority of employees, and would "perpetuate a

limited portion of the elements ordinarily covered by a

collective bargaining agreement," the recall agreement cannot be

said to be independent of the collective bargaining agreement.

Therefore, the court reasoned, the recall agreement did not

survive decertification. Accordingly, the court granted summary

judgment in the Company's favor.

DISCUSSION DISCUSSION

A. Standards of Review A. Standards of Review 

In general, summary judgment is proper only if no

genuine issue of material fact exists and the movant is entitled

to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Therefore, a party seeking summary judgment must make a

preliminary showing that no genuine issue of material fact

exists. Once this showing is made, the non-movant must point to

specific facts demonstrating that there is a trialworthy issue.

National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 

(1st Cir. 1995). An issue is "genuine" when the evidence

relevant to it, viewed in the light most flattering to the non-

moving party, is "sufficiently open-ended to permit a rational

-5-

factfinder to resolve the issue in favor of either side." Id. 

(citation omitted). Because the summary judgment standard

requires the trial court to make a legal determination rather

than to engage in factfinding, appellate review is plenary.

Equal Employment Opportunity Comm'n v. Steamship Clerks Union 

1066, 48 F.3d 594, 602 (1st Cir. 1995). 

This standard is the norm. Having stated it, however,

we must note that under our precedent, in certain, somewhat

unusual cases, this standard does not apply. In a nonjury case,

when the basic dispute between the parties concerns only the

factual inferences that one might draw from the more basic facts

to which the parties have agreed, and where neither party has

sought to introduce additional factual evidence or asked to

present witnesses, the parties are, in effect, submitting their

dispute to the court as a "case stated." Steamship Clerks, 48 

F.3d at 603 (citing Federaci n de Empleados del Tribunal Gen. de 

Justicia v. Torres, 747 F.2d 35, 36 (1st Cir. 1984) (Breyer, 

J.)). The district court is then "freed from the usual

constraints that attend the adjudication of summary judgment

motions," and may engage in a certain amount of factfinding,

including the drawing of inferences. Id. 

By the same token, the appellate court may assume that

the parties considered the matter to have been submitted to the

district court as a case ready for decision on the merits. Id. 

The standard for appellate review consequently shifts from de 

novo review to clear-error review; that is, the district court's 

-6-

factual inferences should be set aside only if they are clearly

erroneous. Id. (citing United States v. Ven-Fuel, Inc., 758 F.2d 

741, 744 n.1 (1st Cir. 1985)).

In the instant case, the parties cross-moved for

summary judgment, yet both agreed that there was no dispute over

the basic facts of the case.2 Nor did either party give any

indication that it intended to present additional evidence or

witnesses, or request a jury trial. The only dispute in the case

stems from the inferences that the parties claim must be drawn

from those basic facts -- what legal significance should be

ascribed to those facts. In effect, therefore, the parties

submitted their case to the district court as a case stated. See 

Steamship Clerks, 48 F.3d at 603 (holding same in virtually 

identical procedural circumstances). Similarly, the parties both

state in their appeal briefs and during oral argument that they

agree upon the basic material facts of the case. Accordingly, we

are bound to apply the more deferential clear-error standard of

review when examining the inferences drawn by the district court.

Id. The district court's legal conclusions nevertheless engender 

 

2 Of course, the mere fact that the parties moved simultaneously
for summary judgment does not automatically change the district
court's analysis or render the customary standard of appellate
review obsolete. Unless the special circumstances described here
are present, "the nisi prius court must consider each motion 
separately, drawing inferences against each movant in turn, and
the court of appeals must engage in de novo review." Steamship 
Clerks, 48 F.3d at 603 n.8 (citing El D a, Inc. v. Hern ndez 
Col n, 963 F.2d 488, 492 n.4 (1st Cir. 1992); Griggs-Ryan v. 
Smith, 904 F.2d 112, 115 (1st Cir. 1990)).  

-7-

de novo review. Id. (citing McCarthy v. Azure, 22 F.3d 351, 354 

(1st Cir. 1994)).

B. The District Court's Decision B. The District Court's Decision 

The Unions' primary contention on appeal is that the

district court erred as a matter of law, and that its ruling is

contrary to the Supreme Court's decision in Retail Clerks 

Internat'l Ass'n Local 128 v. Lion Dry Goods, 369 U.S. 17 (1962). 

Specifically, the Unions argue that the Lion Dry Goods decision 

compels the legal conclusion that the recall agreement in the

instant case is an enforceable contract. We think that the

Unions' argument ascribes too much to the Lion Dry Goods case and 

too little to the district court's decision here.

In addressing the issue of whether the recall agreement

survived the Unions' decertification, the district court began by

noting that "decertification ends the enforceability of any

collective bargaining agreement," and observing that both parties

concede that the Company is no longer obliged to negotiate or

bargain with the Unions or to honor the terms and conditions of

the previous collective bargaining agreements. Going on to

discuss the issue of the recall agreement's continued viability,

the court explained:

[The recall agreement was] [d]rafted
at a time when the Unions were still
certified as majority bargaining
representatives, [and] it requires that
the Unions receive a copy of any recall
notice sent to unreinstated strikers.
The recall contract establishes rights
for this category of represented

-8-

employees and affects their seniority.
Indeed, it specifies that its terms are
to prevail if there is any conflict with
"the other provisions of the labor
agreement" . . . . Thus, the recall 
agreement is tied directly to the 
collective bargaining agreement: it 
supersedes or amends any conflicting
portions of the collective bargaining
agreement; it affects seniority rights
under the collective bargaining
agreement; and its notice requirement
contemplates ongoing union involvement.
To say that this contract survives, then,
would affect any negotiations with a new
union that might seek to represent a
majority of International Paper employees
and in the meantime would perpetuate a
limited portion of the elements
ordinarily covered by a collective
bargaining agreement . . . . The
conclusion is therefore unavoidable that
this recall and seniority contract does
not survive decertification.

I do not need to decide whether a 
company and a union can ever make an 
agreement that will be enforceable after 
a decertification. Here, there is no 
indication in the recall agreement that 
the parties intended it to survive 
decertification . . . . I conclude that 
on the undisputed record the recall
agreement became unenforceable upon
decertification of the Unions.

(Emphasis added)(footnotes omitted). In a footnote to this

discussion, the district court noted that Lion Dry Goods 

"suggests that contracts with minority unions may be enforceable,

but the only matter actually decided there was that jurisdiction

existed under 301 [of the LMRA]."

We agree with the district court that Lion Dry Goods is 

not dispositive of the issue in the instant case. Our reading of

that case indicates that the Supreme Court was only addressing

-9-

the narrow issue of whether a strike settlement agreement between

a minority union and an employer constitutes a "contract" as that

term is employed in 301(a) of the LMRA, 29 U.S.C. 185(a).

Lion Dry Goods, 369 U.S. at 27. Reasoning that the language, 

purpose, and legislative history of the statute do not support

the exclusion of such agreements from the purview of 301(a),

id. at 26-28, the Court held that claims for alleged violations 

of such agreements are "cognizable" under 301(a). Id. at 29- 

30.3

The parties in the instant case disagree over the scope

of the Court's holding in Lion Dry Goods; the Company contends 

that it is merely a grant of jurisdiction, while the Unions

contend that it stands for the proposition that contracts between

unions and employers remain enforceable even after the union has

lost its majority representative status.

We need not resolve this dispute, however. Even

assuming arguendo that Lion Dry Goods holds, as the Unions claim, 

that contracts between unions and employers are enforceable after

decertification, it cannot by any stretch be said to require that

all such contracts must be enforced regardless of the intentions 

of the parties to the contract. Indeed, the district court did 

not hold that recall agreements were as a general matter

unenforceable after decertification. It merely analyzed the
 

3 In so holding, the Court rejected arguments that the language
of 301 contemplated only those contracts between employers and
unions representing a majority of employees, explaining that the
language and history of the statute did not support such a narrow
construction. Id. at 28-29. 

-10-

agreement before it, and inferred from the undisputed facts that

the agreement had not been intended to survive decertification. 

The Lion Dry Goods case, regardless of the scope of its holding, 

is therefore inapposite, and the Unions' reliance on it

misplaced.4

Having disposed of this argument, we are left only with

the Unions' contentions that the district court drew

impermissible inferences in concluding, based on the undisputed

factual record before it, that the parties did not intend the

recall agreement to survive decertification. As we explained

supra, however, we review these inferences only for clear error. 

After carefully examining the record, we can discern no such

clear error on the part of the district court.

The Unions challenge the district court's finding that

the recall agreement contemplated an "ongoing relationship"

between the parties and therefore could not have been intended to

 

4 Contrary to the Unions' arguments, the district court's
decision did not hinge on the fact that the Unions no longer had
majority representative status. Rather, the court explained that
because it found that the recall agreement, by its very terms,
was "tied directly" to the unenforceable collective bargaining
agreement, it had not been intended to survive the Unions'
decertification. In other words, the court's decision rested not
on the status of the Unions, but upon indicia of the parties'
intentions in negotiating the agreement.

We also reject the Unions' arguments that the district court's
concern that the recall agreement would affect a successor
union's ability to represent Company employees is "ill-founded"
in light of the Lion Dry Goods case. The parties in Lion Dry 
Goods explicitly agreed that their contract would have effect 
even after the Union lost its majority representative status, 369
U.S. at 22-23, a crucial fact markedly absent in the instant
case.

-11-

remain in effect after the Unions' decertification. The Unions

concede that the provisions cited by the district court are

characterized accurately; the Unions urge, however, that "it

could just as equally be said" that the agreement was intended to

survive decertification. The Unions offer no facts or evidence

in support of this argument, nor do they claim that this actually

was the parties' intent. They also do not indicate how the

district court's inference was unreasonable or erroneous; they

merely claim that the opposite conclusion could have been made in 

interpreting the agreement. We think that the district court's

inferences based on the undisputed record were well-supported and

reasonable. We certainly cannot say that they rise to the level

of clear error, so we must reject the Unions' argument on this

score.

Similarly, we are not persuaded by the Unions' argument

that the district court erred in concluding that the absence of

an expiration date in the agreement, among other indicia,

supported the inference that it was not intended to survive

decertification. We agree that the absence of an expiration date

could be interpreted to mean that the parties intended the 

agreement to remain in effect until all employees' recall rights

were exhausted, regardless of the Unions' representative status.

We do not see, however, nor do the Unions point to, any reason

that the district court's conclusion to the contrary was

unreasonable. The decertification petition was pending

throughout the parties' negotiations, and neither party could

-12-

have accurately predicted when it would take place. Certainly,

if the Unions had intended for the recall agreement to survive

their possible decertification, they could have bargained for

such a provision. We think that the absence of such a provision

or expiration date, under these circumstances, just as reasonably

supports the inference that the parties had not intended the 

agreement to survive. We therefore find no error in the

district court's conclusion to this effect.

CONCLUSION CONCLUSION

Finding no clear error, we affirm. 

-13-