**TOLEDO FAIR HOUSING CENTER et al.**

**v.**

**NATIONWIDE MUTUAL INSURANCE COMPANY et al.**

Court of Common Pleas of Ohio,
Lucas County.

No. CI93—1685.

Decided Aug. 11, 1997.

*Cooper, Walinski & Cramer, Stephen Dane, Janet Hales* and *Margaret Lockhart; Washington Lawyers Committee for Civil Rights Under Law* and *John P. Relman; Richard J. Ritter; William Howard Lynch; Hall, Patterson & Charne, S.C.,* and *Gretchen Elizabeth Miller,* for plaintiffs.

*Fox & Grove, Jeffrey Goldman, Allison Blakely, Joel Rice* and *Diane Cifuentes Gerew; Fuller & Henry* and *Martin J. Witherell,* for defendants.

---

FREDERICK H. MCDONALD, Judge.

This class action case is before the court upon the following motions: (1) a motion for summary judgment filed by defendants Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company (collectively "Nationwide") as to plaintiffs' claims for classwide relief, (2) a motion for partial summary judgment filed by the plaintiffs, and (3) a motion for summary judgment as to the individual plaintiffs' claims filed by Nationwide. Upon consideration of the pleadings, the record, the written arguments of counsel, and the applicable law, I find that Nationwide's motions should be denied and that the plaintiffs' motion should be denied.

## I

The plaintiffs are the Toledo Fair Housing Center and several individual plaintiffs. Many of the individual plaintiffs represent a class of homeowners who, since 1979, have owned a home in an "African–American" neighborhood.[1] The plaintiffs allege that Nationwide engages in redlining in its offering of homeowner's insurance in violation of R.C. 4112.02(H)(4).[2] Particularly, for purposes

---

**1.** For purposes of identifying the class, "African–American neighborhood" has been defined as any neighborhood in the city of Toledo that, according to 1990 census data, has an African–American population greater than fifty percent.

**2.** R.C. 4112.02(H)(4) provides that it is an unlawful discriminatory practice for any person to "[d]iscriminate against any person in the terms or conditions of selling, transferring, assigning, renting, leasing, or subleasing any housing accommodations or in furnishing facilities, services, or privileges in connection with the ownership, occupancy, or use of any housing accommodations, including the sale of fire, extended coverage, or homeowner's insurance, because of race, color, religion, sex, familial status, ancestry, handicap, or national origin or because of the racial composition of the neighborhood in which the housing accommodations are located."

of the plaintiffs' motion, the plaintiffs argue that two of Nationwide's underwriting guidelines, the minimum insurance amount and maximum dwelling age,[3] have a disparate impact on homeowners in African–American neighborhoods. The plaintiffs now move for summary judgment on these disparate-impact issues. In support of their motion, the plaintiffs have offered excerpts of certain deposition testimony as well as a report prepared by Dr. Samuel Attoh and James R. Weaver, Jr. ("the Attoh report.") Nationwide opposes the plaintiffs' motion.

Nationwide also moves for summary judgment, arguing that, as a matter of law, the following guidelines do not have a disparate impact on African–American neighborhoods: (1) the minimum insurance amount, (2) the maximum dwelling age, and (3) the consideration of the ratio of market value to replacement cost in determining whether a risk should be written and, if so, on what policy form. Additionally, Nationwide moves for summary judgment on the plaintiffs' claims that (1) Nationwide's failure to alter certain underwriting practices is evidence of intentional discrimination, and (2) Nationwide's target marketing practices intentionally discriminate against African–American neighborhoods. Nationwide also moves for summary judgment on the individual plaintiffs' claims. The plaintiffs oppose Nationwide's motions.

## II

The general rules governing motions for summary judgment filed pursuant to Civ.R. 56 are well established. In *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47, the Supreme Court of Ohio stated the requirements that must be met before a motion for summary judgment can be granted:

"The appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.

"The burden of showing that no genuine issue exists as to any material fact falls upon the moving party in requesting a summary judgment."

A party who claims to be entitled to summary judgment on the ground that a nonmovant cannot prove its case bears the initial burden of (1) specifically

---

3. Briefly, the minimum insurance amount guideline sets a minimum home value below which Nationwide will not offer homeowners insurance. The maximum dwelling age guideline sets a maximum dwelling age above which Nationwide will not offer guaranteed replacement coverage insurance.

identifying the basis of its motion, and (2) identifying those portions of the record that demonstrate the absence of a genuine issue of material fact regarding an essential element of the nonmovant's case. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 273–274; see, also, *Dresher,* 75 Ohio St.3d at 299, 662 N.E.2d at 277–278 (Pfeifer, J., concurring in judgment only). The movant satisfies this burden by calling attention to some competent summary judgment evidence of the type listed in Civ.R. 56(C), affirmatively demonstrating that the nonmovant has no evidence to support his or her claims. *Id.* Once the movant has satisfied this initial burden, the burden shifts to the nonmovant to set forth specific facts, in the manner prescribed by Civ.R. 56(E), indicating that a genuine issue of material fact exists for trial. *Dresher,* 75 Ohio St.3d at 293, 662 N.E.2d at 273–274. Accord *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 114–115, 526 N.E.2d 798, 800–802.

The Sixth District Court of Appeals has consistently held that summary judgment should be granted with caution in order to protect the nonmoving party's right to trial. As stated by the court in *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 14–15, 13 OBR 8, 16, 467 N.E.2d 1378, 1386:

"We recognize that summary judgment, pursuant to Civ.R. 56, is a salutary procedure in the administration of justice. It is also, however, a procedure which should be used cautiously and with the utmost care so that a litigant's right to a trial, wherein the evidentiary portion of the litigant's case is presented and developed, is not usurped in the presence of conflicting facts and inferences. It is settled law that '[t]he inferences to be drawn from the underlying facts contained in the affidavits and other exhibits must be viewed in the light most favorable to the party opposing the motion, * * * ' which party in the instant case is appellant. *Hounsell v. Am. States Ins. Co.* (1981), 67 Ohio St.2d 427, 433 [21 O.O.3d 267, 271, 424 N.E.2d 311, 315]. It is imperative to remember that the purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist." (Citations omitted.)

### III

#### A. Disparate Impact

Both the plaintiffs and Nationwide move for summary judgment on the question of whether the minimum insurance amount or the maximum dwelling age guidelines have a disparate impact on African–American neighborhoods. Therefore, these motions will be treated as cross-motions on those disparate-impact questions.

#### 1. Applicability of Disparate–Impact Analysis

■ As to these cross-motions, the first major issue is whether the instant case is appropriate for disparate-impact analysis. Nationwide argues that the dispa-

rate-impact approach should not be applied in this case because (1) it undermines the insurance business, (2) it conflicts with the Ohio Insurance Code, (3) it interferes with the Ohio FAIR Plan, and (4) disparate-impact analysis is preempted by a federal statute, the Urban Property Protection and Reinsurance Act of 1968, Section 1749bbb–1749bbb–21, Title 12, U.S.Code ("UPPRA").[4]

First, I find that the disparate-impact approach does not unduly undermine the business of selling insurance. Assuming, as Nationwide argues, that the insurance industry is based on "fair" risk discrimination, the disparate-impact approach will not impede such fair discrimination if the insurer can show a business necessity. See, *e.g., Griggs v. Duke Power Co.* (1971), 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158, 164–165; Section 2000e–2(k)(1)(A)(i), Title 42, U.S.Code.

Second, the disparate-impact approach does not conflict with Ohio insurance law, R.C. Chapter 3901. The cases cited by Nationwide do not support the proposition that the Ohio legislature intended the Superintendent of Insurance to have primary jurisdiction over cases such as this. R.C. Chapter 3901 addresses the minutia of running an insurance company; it does not deal with such broader topics as the civil rights implications of offering certain types of insurance to certain groups of people. And, though R.C. 3901.21(M) makes it an unfair trade practice to engage in unfair discrimination in offering insurance, it does not deal with the specific situation of race discrimination in the offering of homeowner's insurance. See R.C. 4112.02(H)(4) (prohibiting, *inter alia,* race discrimination in the sale of homeowner's insurance).

■ Third, the disparate-impact approach does not interfere with the Ohio FAIR Plan. The Ohio FAIR Plan exists to help homeowners who have been

---

**4.** In its supplemental brief, Nationwide also calls attention to a Fourth Circuit case, *Williams v. 5300 Columbia Pike Corp.* (C.A.4, 1996), 103 F.3d 122. In *Williams,* the plaintiffs objected to a plan to convert dwelling units from co-ops to condominiums. According to the plaintiffs, the plan had a disparate impact on African–Americans and the disabled, who were less able to qualify for financing. The court in *Williams* found no disparate impact. *Williams,* however, is distinguishable on several points. Most notably, the court in *Williams* stated, "All residents of the Carlyle House were invited and encouraged to participate in the conversion plan; if everyone had been able to secure the requisite financing * * * no one would have been excluded." *Williams, supra.* In the instant case, not every homeowner in an African–American neighborhood has been "invited" or "encouraged" by Nationwide to apply for homeowners insurance. And it is not true in this case that, but for a lack of money, homeowners in African–American neighborhoods could have procured Nationwide homeowner's insurance. Further, contrary to Nationwide's contention, *Williams* cannot fairly be read as precluding all disparate-impact cases under the federal Fair Housing Act; a fairer reading of *Williams* is that it disallowed a disparate-impact claim under the particular circumstances present in that case. Even if it were true that the Fourth Circuit disallowed all disparate-impact claims under the federal Fair Housing Act, the present case is not filed under the federal Fair Housing Act. And, in any event, *Williams,* an unreported federal case, is not binding in this case.

unable to secure homeowner's insurance, R.C. 3929.41; it does not permit insurance redlining.

■ Finally, UPPRA does not preempt enforcement of R.C. Chapter 4112 through use of the disparate-impact approach. According to the United States Supreme Court, within constitutional limits, Congress may preempt state law either expressly or implicitly. *Pacific Gas & Elec. v. State Energy Resources Conservation & Dev. Comm.* (1983), 461 U.S. 190, 203–204, 103 S.Ct. 1713, 1721–1722, 75 L.Ed.2d 752, 765. If Congress' intent to preempt is not expressly stated, an intent to completely preempt state law on a given topic may be found from "a ' "scheme of federal regulation * * * so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." ' *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675] (1982), quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed.2d 1447, 1459] (1947)." *Id.*

If Congress does not intend to completely preempt state law, state law is preempted to the extent that it conflicts with the federal law, making compliance with both sets of law a "physical impossibility." *Id.*

Nationwide does not contend that UPPRA explicitly preempts disparate-impact enforcement of the Ohio Civil Rights Act, R.C. Chapter 4112. Instead, Nationwide apparently contends that UPPRA partially preempts the Ohio Civil Rights Act because disparate-impact enforcement interferes with the goals of Congress in enacting UPPRA. This contention is not supported by the legislative history of UPPRA. The legislative history provides:

" '(a) The Congress finds that (1) the vitality of many American cities is being threatened by the deterioration of their inner city areas; responsible owners of well-maintained residential, business, and other properties in many of these areas are unable to obtain adequate property insurance coverage against fire, crime, and other perils; the lack of such insurance coverage accelerates the deterioration of these areas by discouraging private investment and restricting the availability of credit to repair and improve property therein; and this deterioration poses a serious threat to the national economy; * * * (3) the capacity of the private property insurance industry to provide adequate insurance is threatened, and the continuity of such property insurance protection is essential to the extension of credit in these areas; and (4) the national interest demands urgent action by the Congress to assure that essential lines of property insurance, including lines providing protection against riot and civil commotion damage will be available to property owners at reasonable cost.

" '(b) the purposes of this title * * * are, therefore, to (1) encourage and assist the various State insurance authorities and the property insurance industry to develop and carry out statewide programs which will make necessary property insurance coverage against the fire, crime, and other perils more readily available for residential, business, and other properties meeting reasonable underwriting standards * * *.' " Section 1749bbb, Title 12, U.S.Code, Congressional Findings and Declaration of Purpose.

It appears, based on the legislative history, that UPPRA and disparate-impact enforcement of the Ohio Civil Rights Act complement, rather than conflict with, each other. They have similar purposes, but coverage of UPPRA does not appear to be so "pervasive as to make reasonable the inference that Congress left no room for the states to supplement it." *Pacific Gas*, 461 U.S. at 204, 103 S.Ct. at 1722, 75 L.Ed.2d at 765. It therefore does not appear that Congress intended to preempt, either partially or completely, disparate-impact enforcement of R.C. Chapter 4112.

Upon consideration of Nationwide's arguments and the applicable law, I find that disparate-impact analysis is applicable to this case. Accordingly, to the extent that Nationwide's motion for summary judgment on the disparate-impact claims rests on the inapplicability of disparate-impact analysis, the motion must be denied.

## 2. Admissibility of the Attoh Report

■ The second major issue raised by the cross-motions for summary judgment is whether the Attoh report is admissible. Nationwide argues that the report is inadmissible because Dr. Attoh exercised no professional expertise in conducting his study. According to Nationwide, Dr. Attoh has no expertise in the analysis of insurance redlining and no knowledge of insurance underwriting guidelines. Nationwide argues that Dr. Attoh's understanding of Nationwide's underwriting guidelines was derived from information provided by the plaintiffs. Likewise, according to Nationwide, Dr. Attoh played no role in deciding which neighborhoods to study, and he failed to consider other variables, such as fire rates, that bear upon a homeowner's eligibility for homeowner's insurance.

Nationwide's arguments are not well taken. Dr. Attoh was not engaged as an insurance expert: he was engaged to do a specific statistical analysis. In doing his analysis, he was asked to assume certain facts (*e.g.*, the definition of an "African–American neighborhood" and the existence and meaning of certain underwriting guidelines), none of which is in dispute. Based on these assumed facts, he was asked to conduct a statistical analysis and determine whether the guidelines have a disparate impact on African–American neighborhoods. He found that they do. In arriving at this conclusion, he exercised professional

expertise and judgment because he conducted an independent statistical analysis that he designed. Finally, according to the plaintiffs, Dr. Attoh did not consider fire rates because he was not asked to. His failure to do so, if anything, may affect the plaintiffs' ability to prove their case, but it does not render the report inadmissible as a whole.

3. Disparate Impact of Minimum Insurance Amount and Maximum Dwelling Age Guidelines

For purposes of deciding these cross-motions for summary judgment, the third major issue is whether the minimum insurance amount and the maximum dwelling age underwriting guidelines have a disparate-impact on African–American neighborhoods. The disparate-impact theory was first approved by the United States Supreme Court in *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853, 28 L.Ed.2d at 164 ("The [Civil Rights Act of 1964] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation."). Distinct from disparate-treatment theory, which requires proof of discriminatory intent, the disparate-impact theory applies to practices or policies that are facially neutral but have a discriminatory effect. *Wards Cove Packing Co. v. Atonio* (1989), 490 U.S. 642, 645–646, 109 S.Ct. 2115, 2118–2119, 104 L.Ed.2d 733, 744–745; *Equal Emp. Opportunity Comm. v. Steamship Clerks Union, Local 1066* (C.A.1, 1995), 48 F.3d 594, 600–601, certiorari denied (1995), 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27; *Fitzpatrick v. Atlanta* (C.A.11, 1993), 2 F.3d 1112, 1117.[5]

The plaintiff in a disparate-impact suit has the burden of establishing a prima facie case of discrimination. The prima facie case has three elements: (1) identification, (2) impact, and (3) causation. *Steamship Clerks Union*, 48 F.3d at 601. The first element, identification, requires the plaintiff to specifically identify the practice or policy alleged to have caused the disparate impact. *Wards Cove*, 490 U.S. at 656, 109 S.Ct. at 2124, 104 L.Ed.2d at 750–751; *Steamship Clerks Union*, 48 F.3d at 601. According to the United States Supreme Court, it is not enough for a plaintiff merely to point to a statistical disparity in the workforce; the plaintiff must point to the specific practice or policy believed to have caused

---

**5.** Though *Griggs* and its progeny (including *Wards Cove*) are employment-discrimination cases, the parties appear to agree that the theoretical model employed in these cases applies with equal force in this case. Generally speaking, Title VII analysis applies to cases alleging violations of the Ohio Civil Rights Act, R.C. Chapter 4112. See, *e.g.*, *Little Forest Med. Ctr. v. Ohio Civ. Rights Comm.* (1991), 61 Ohio St.3d 607, 610–611, 575 N.E.2d 1164, 1167–1169, rehearing denied (1991), 62 Ohio St.3d 1434, 578 N.E.2d 826, certiorari denied (1992), 503 U.S. 906, 112 S.Ct. 1263, 117 L.Ed.2d 491; *Coleman v. Warner* (1992), 82 Ohio App.3d 263, 267, 611 N.E.2d 878, 880–881, motion overruled (1993), 66 Ohio St.3d 1402, 605 N.E.2d 1260, motion denied (1993), 510 U.S. 974, 114 S.Ct. 465, 126 L.Ed.2d 417.

the disparity. *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124, 104 L.Ed.2d at 750–751.

The second element requires the plaintiff to show the disparate impact. Usually, a sophisticated statistical analysis is required to establish impact, but statistics are not always necessary. *Pumphrey v. Coeur D'Alene Police Dept.* (C.A.9, 1994), 17 F.3d 395 (statistics not necessary to show that police department policy requiring police officers to carry large-grip Smith & Wesson .669 firearm had disparate impact on women officers, whose hands on average are smaller than men's). If statistics are employed, the proper comparisons must be made. For example, in *Wards Cove,* the plaintiffs alleged a statistical disparity between cannery jobs, which were filled mostly by nonwhites, and noncannery jobs, which were filled mostly by whites. The court held that the mere comparison between the percentage of nonwhites and whites in these two types of positions was too simplistic: if the percentage of nonwhites in noncannery positions was low due to a lack of qualified nonwhite applicants in the labor market, the disparity was not caused by a discriminatory policy. *Wards Cove,* 490 U.S. at 650–653, 109 S.Ct. at 2121–2123, 104 L.Ed.2d at 747–749. Instead, the proper comparison is between the racial composition of the jobs at issue and the racial composition of the qualified population in the relevant labor market. *Id.* at 650, 109 S.Ct. at 2121, 104 L.Ed.2d at 747. [6]

The third element requires the plaintiff to show causation. *Id.* at 657, 109 S.Ct. at 2124–2125, 104 L.Ed.2d at 751–752. According to the court in *Wards Cove:*

"Respondents will also have to demonstrate that the disparity they complain of is the result of one or more of the employment practices that they are attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for whites and nonwhites. To hold otherwise would result in employers being potentially liable for the 'myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.*

After the plaintiff has established a prima facie case, the burden shifts to the defendant. After some initial dispute, courts now hold that the defendant has the burden of showing business necessity. See *Mountain Side Mobile Estates Partnership v. Secy. of Hous. & Urban Dev.* (C.A.10, 1995), 56 F.3d 1243, 1254; *Fitzpatrick,* 2 F.3d at 1117; *Pumphrey, supra; Steamship Clerks Union,* 48 F.3d at 607. See, also, Note, The Civil Rights Act of 1991: The Business

---

**6.** Alternatively, if labor market statistics are unavailable, other measures, such as the racial composition of "otherwise qualified applicants" for the at-issue jobs, are equally probative. *Wards Cove,* 490 U.S. at 651, 109 S.Ct. at 2121–2122, 104 L.Ed.2d at 747–748.

Necessity Standard (1993), 106 Harv.L.Rev. 896, 910.[7] This is a burden of persuasion, not merely a burden of production. See Section 2000e–2(k)(1)(A)(i), Title 42, U.S.Code (disparate impact established if plaintiff "demonstrates" that defendant uses an employment practice that causes a disparate impact and defendant fails to "demonstrate" that challenged practice is job-related and consistent with business necessity); *Fitzpatrick*, 2 F.3d at 1117. If the defendant succeeds in demonstrating business necessity, the challenged practice or policy is "deemed justifiable, its regrettable discriminatory effects notwithstanding." *Fitzpatrick*, 2 F.3d at 1118. Nevertheless, at this stage the plaintiff can still prevail if she can demonstrate that another policy with lesser discriminatory effects would comparably serve the employer's business needs. *Id.; Wards Cove*, 490 U.S. at 660, 109 S.Ct. at 2126–2127, 104 L.Ed.2d at 753–754. The defendant's failure to employ such alternative practices establishes that the challenged policy or practice is a pretext for discrimination. *Id.* at 660–661, 109 S.Ct. at 2126–2127, 104 L.Ed.2d at 753–754. Of course, the suggested alternative must be viable and equally as effective as the challenged practice or policy. According to the court in *Wards Cove:*

" 'Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employer's legitimate business goals.' *Watson* [*v. Fort Worth Bank & Trust* (1988), 487 U.S. 977, 998, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827, 847 (O'Connor, J.) ]. 'Courts are generally less competent than employers to restructure business practices,' *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 [98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 964] (1978); consequently, the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit." *Wards Cove*, 490 U.S. at 661, 109 S.Ct. at 2127, 104 L.Ed.2d at 754.

Applying the law to the facts of this case, the plaintiffs have presented sufficient evidence to establish the first element of a disparate-impact case: identification. See *Wards Cove*, 490 U.S. at 656, 109 S.Ct. at 2124, 104 L.Ed.2d at 750–751; *Steamship Clerks Union*, 48 F.3d at 601. The plaintiffs have clearly identified two underwriting guidelines (the minimum insurance amount and the

---

7. According to the legislative history, the purpose of the Civil Rights Act of 1991 was "to codify the concepts of 'business necessity' and 'job related' *enunciated by the Supreme Court in Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), and in the other Supreme Court decisions *prior* to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 [109 S.Ct. 2115, 104 L.Ed.2d 733] (1989)[.]" (Emphasis added.) Section 1981, Title 42, U.S.Code, Historical and Statutory Notes. The statute itself provides, "(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis or race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice *is job related for the position in question and consistent with business necessity* * * *." (Emphasis added.) Section 2000e–2(k)(1)(A)(i), Title 42, U.S.Code.

maximum dwelling age) that the plaintiffs allege have a disparate impact on African–American neighborhoods.

The second element is impact. With regard to the minimum insurance amount, the plaintiffs' evidence of impact is that this guideline excludes 82.9 percent of homeowners in African–American neighborhoods as compared to 31 percent in white neighborhoods. Conversely, according to the Attoh report, since this guideline allows 17.1 percent of homeowners in African–American neighborhoods to qualify for homeowner's insurance as compared to 69 percent in white neighborhoods, homeowners in white neighborhoods are four times more likely than homeowners in African–American neighborhoods to qualify for Nationwide homeowner's insurance. With regard to the maximum dwelling age guideline, the Attoh report states that 92.6 percent of homes in African–American neighborhoods were built before 1959 and would therefore be excluded, as compared to 61.3 percent in white neighborhoods. Similarly, according to the Attoh report, 97.3 percent of homes in African–American neighborhoods were built before 1969 as compared to 77.6 percent in white neighborhoods. In contrast, Nationwide's expert, Dr. William Wecker, testified that, when controlling for fire rates, the two underwriting guidelines do not have a disparate impact on African–American neighborhoods. In fact, according to Dr. Wecker, after controlling for fire rates, the two guidelines actually have a greater impact on white neighborhoods. Because the experts disagree, a genuine issue of fact exists as to whether these two guidelines have a disparate impact on African–American neighborhoods.

4. Ratio of Market Value to Replacement Cost Guideline

In his analysis, Dr. Wecker examined only the minimum insurance amount and the maximum dwelling age guidelines and did not address the guideline relating to consideration of the ratio of market value to replacement cost. Since Nationwide has not shown through Dr. Wecker's testimony or other evidence that this guideline does not have a disparate impact, Nationwide has not established that it is entitled to summary judgment on this issue.

5. Business Necessity

Even though genuine issues of material fact exist as to whether the three underwriting guidelines have a disparate impact on African–American neighborhoods, Nationwide can still prevail if it can show business necessity. Nonetheless, the record reveals substantial questions of fact as to whether the three underwriting guidelines in question are justified by business necessity. Accordingly, the cross-motions for summary judgment on the minimum insurance amount and maximum dwelling age guidelines and Nationwide's motion on the ratio of market value to replacement cost guideline must be denied. Because of

this ruling, it is unnecessary to address the sufficiency of the established impact, causation, and whether less discriminatory alternatives exist.

B.  Classwide Disparate Treatment

In addition to moving for summary judgment on the three disparate-impact claims discussed above, Nationwide also moves for summary judgment on two of the plaintiffs' classwide disparate-treatment claims.  These claims are (1) that Nationwide's failure to alter certain underwriting guidelines is evidence of intentional discrimination, and (2) that Nationwide's target marketing practices intentionally discriminate against African–American neighborhoods.[8]

In classwide disparate-treatment (or "pattern or practice") cases, the plaintiff bears the burden of showing that discrimination is "built in" to the defendant's policies or procedures, or, in other words, that discrimination is the defendant's standard operating procedure.  Discussing the burden of proof in a pattern or practice case, the United States Supreme Court stated:

"As the plaintiff, the Government bore the initial burden of making out a prima facie case of discrimination.  And, because it alleged a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights, the Government ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts.  It had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice."  *Internatl. Bhd. of Teamsters v. United States* (1977), 431 U.S. 324, 336, 97 S.Ct. 1843, 1854–1855, 52 L.Ed.2d 396, 416.

Similarly, in *Franks v. Bowman Transp. Co.* (1976), 424 U.S. 747, 772, 96 S.Ct. 1251, 1267–1268, 47 L.Ed.2d 444, 466, the court held that the plaintiffs made out a prima facie case of discrimination against the individual plaintiffs by "demonstrating the existence of a discriminatory hiring pattern and practice."  *Id.* at 772, 96 S.Ct. at 1268, 47 L.Ed.2d at 466.  Discussing the *Franks* case, the court in *Teamsters* stated:

"The *Franks* case thus illustrates another means by which a Title VII plaintiff's initial burden of proof can be met.  The class there alleged a broad-based policy of employment discrimination; upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in

---

8. Though they did not raise the issue in their own motion, the plaintiffs, in opposing Nationwide's motion for summary judgment, argue that Nationwide's Local Area Marketing Plan map ("LAMP map"), which Nationwide uses to classify "good" neighborhoods by ZIP code, is evidence of disparate impact.  However, given the ruling denying Nationwide's motion for summary judgment, it is unnecessary to resolve whether the LAMP map shows disparate impact.

pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference." *Teamsters,* 431 U.S. at 359, 97 S.Ct. at 1867, 52 L.Ed.2d at 430.

More specifically discussing the shifting burdens in pattern or practice cases, the court in *Teamsters* stated:

"The plaintiff[s'] * * * initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial, 'liability' stage of a pattern-or-practice suit the [plaintiffs are] not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. [Their] burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant." (Emphasis added.) *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867, 52 L.Ed.2d at 430.

■ Often, in a pattern or practice case, the plaintiffs offer evidence of individual instances of discrimination to bolster their statistical evidence. See, *e.g., Teamsters,* 431 U.S. at 338, 97 S.Ct. at 1855–1856, 52 L.Ed.2d at 417. The plaintiffs are not required, however, to offer evidence of individual discrimination for each class member: once established, the prima facie case creates an inference that the defendant discriminated against all class members. *Id.* at 360, 97 S.Ct. at 1867, 52 L.Ed.2d at 430–431.

■ The plaintiffs have the initial burden of making out a prima facie case of classwide disparate treatment. The plaintiffs have offered the following evidence in support of their claims that Nationwide's target marketing practices and its failure to alter certain underwriting guidelines constitute classwide discrimination:

1. Nationwide's LAMP map, which ranks ZIP codes by desirability, ranks Toledo's five African–American ZIP codes in the bottom five places;

2. evidence purporting to show that none of the forty active Nationwide agents with offices in the Toledo metropolitan has an office in an African–American ZIP code, and all of these agents are white;

3. evidence purporting to show disparate treatment of individual testers who gave addresses in African–American neighborhoods as compared to testers who gave addresses in white neighborhoods;

4. agents' notes showing a "consistent concern for geographic location in Toledo";

5. testimony in other litigation by former Nationwide agents that Nationwide instructs its agents to avoid business in minority neighborhoods;

6. evidence that certain testers who gave an address in an African–American neighborhood were "dump[ed]" into the Ohio FAIR Plan, which offers "inferior," high-cost insurance;

7. evidence purporting to show the disparate impact of certain of Nationwide's underwriting guidelines on African–American neighborhoods;

8. evidence that certain of Nationwide's eligibility standards have racial connotations and serve as surrogates for racial redlining (*e.g.,* preference for "upscale," "desirable" clients, "pride of ownership," etc.);

9. undisputed evidence that Nationwide does not advertise in the minority media;

10. statistical evidence of an uneven market penetration in the city of Toledo (*i.e.,* higher market penetration in white ZIP codes as opposed to African–American ZIP codes);

11. undisputed evidence of more favorable pricing for certain white ZIP codes;

12. the deposition of J. Robert Hunter, in which Hunter states his opinion that Nationwide's marketing, pricing, and underwriting practices have been set up to "result in unfair results by territory";

13. the affidavit of Terry Novak, a former Detroit-area Nationwide agent, in which he testifies that, at least in a couple of instances, he became aware that Nationwide kept track of the race of Nationwide claimants; and

14. the verified complaint of John Askin, a Nationwide agent who sued Nationwide in Kentucky, in which he alleges that he was "pressured and ordered" by Nationwide management to engage in redlining.

Nationwide contends that the plaintiffs' evidence is insufficient because:

1. the minimum insurance amount and maximum dwelling age guidelines do not have a disparate impact on African–American neighborhoods;

2. plaintiffs' evidence that certain of Nationwide's other guidelines have racial connotations is speculative and insignificant;

3. legitimate business reasons exist for using the LAMP map and other target marketing tools;

4. Nationwide does not instruct its agents where to locate; it only "recommends" favorable markets;

5. comments in agent files allegedly showing a concern for geographic location do not raise an inference of intentional discrimination;

6. Nationwide has legitimate reasons for referring certain potential clients to the Ohio FAIR Plan;

7. no law requires Nationwide to advertise at all, let alone to advertise in the minority media; and

8. with regard to certain white ZIP codes being placed in a lower rated territory, the Ohio Superintendent of Insurance authorized such pricing, such pricing is actuarially supported, and these ZIP codes are better rated for reasons unrelated to race.

Upon consideration of the record, I find that significant questions of fact exist as to whether Nationwide's target marketing plan and its underwriting guidelines are used to intentionally discriminate against African–American neighborhoods. Therefore, Nationwide is not entitled to summary judgment on the plaintiffs' claims of classwide disparate treatment.[9]

C. Individual Disparate Treatment

Nationwide moves for summary judgment on the plaintiffs' individual claims for relief, arguing that both the testers and the Toledo Fair Housing Center lack standing and that the claims of plaintiffs Helen Phillips, Marie Boyd, Sandra and James Sutton, Nellie Edwards, and Charles Taylor are time-barred. In an opinion and journal entry file-stamped December 28, 1993, this court already determined that the named plaintiffs have standing and that their claims are not time-barred. Since nothing in the record requires a reconsideration of that ruling, it will not be disturbed.

Nationwide also argues that the plaintiffs' evidence is insufficient to create an inference of discrimination and, in the case of current or former policyholders, Nationwide had legitimate nondiscriminatory reasons for its actions. Applying the standard set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668,[10] I find that significant questions of fact exist as to whether

---

9. Nationwide also argues that some of the plaintiffs' evidence is inadmissible, namely, the Attoh report, the deposition testimony in other litigation from former Nationwide agents, the Hunter deposition, the Novak affidavit, and the complaint of John Askin. As was found earlier in this opinion, the Attoh report is admissible. As to the deposition testimony, the Novak affidavit, and the Askin complaint, even if this evidence is inadmissible, the remaining evidence is sufficient to withstand summary judgment.

10. In *McDonnell Douglas*, the court held that a plaintiff establishes a prima facie case of individual disparate treatment by showing "(i) that he belongs to a racial minority; (ii) that he

Nationwide treated the plaintiffs differently than individuals in white neighborhoods and, if so, whether Nationwide had legitimate nondiscriminatory reasons for doing so. Accordingly, Nationwide's motion for summary judgment as to the individual plaintiffs' claims will be denied.

## JOURNAL ENTRY

It is ordered that the plaintiffs' motion for partial summary judgment on the disparate impact of Nationwide's minimum insurance amount and maximum dwelling age guidelines is denied. It is further ordered that the motion for summary judgment on plaintiffs' claims for classwide relief and the motion for summary judgment on the individual plaintiff's claims for relief filed by Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company are denied.

*Motions denied.*

applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected, and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.